774 F.2d 1164
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
United States of America, Plaintiff-Appellee,
v.
Nathaniel Burris, Defendant-Appellant.
 No. 84-1811
 United States Court of Appeals, Sixth Circuit.
 9/13/85
 
 E.D.Mich.
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
 Before: MATIN and CONTIE, Circuit Judges; and HOGAN, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Nathaniel Burris appeals his jury conviction of one count of aiding and abetting the misappropriation of postal funds in violation of 18 U.S.C. Sec. 1711 and 18 U.S.C. Sec. 2. The jury acquitted him of one charge of conspiracy to defraud the United States, 18 U.S.C. Sec. 371, and one charge of converting public money and property to his own use, 18 U.S.C. Sec. 641. We believe that the evidence was insufficient to support the conviction, so we reverse the judgment on the remaining count.
 
 
 2
 Nathaniel Burris' brother, George Burris, was employed as a window clerk at a United States Post Office in Detroit. As a window clerk, George sold stamps and accepted cash or check payment for them. On several occasions prior to the incident in question, examination of the inventory and accounts at George's window revealed 'shortages,' i.e., the money taken in at the window was less than the amount required to account for the inventory that went out. Due to these recurring shortages, postal supervisors decided to transfer George to another post office.
 
 
 3
 On May 9, 1983, George was informed by letter that he was being reassigned. Ms. Marva Chapman testified that she is a supervisor for the Postal Service and that it is mandatory that every clerk who is reassigned is the subject of an audit. She also testified that once George knew that he was going to be reassigned he knew that he would be audited. An audit conducted on May 12, 1983 showed that George had a shortage of approximately $15. On May 19, 1983, however, a check in the amount of $1,300 received at George's window was returned to the post office as non-negotiable and the shortage then equalled $1,315.15.
 
 
 4
 The returned check, which was made payable to 'Detroit Postmaster,' was drawn on the account of Northwest Men's League and bore the signature of 'Teliferro Witcher.' The account had been closed since October 1978.
 
 
 5
 Nathaniel Burris testified that his brother, George, contacted him on May 9, 1983 and asked him if he had 'any old check laying around.' The following day, George called again to ask if Nathaniel had found such a check. George stated, 'I need it pretty bad.' When Nathaniel asked him why he needed the check, George answered, 'I tell you about it later. I just need it for a couple of days.' Nathaniel further testified that he found an old check on which he had written the name 'Teliferro Witcher'[1] and that he took the check to the post office and gave it to George on May 11, 1983.[2]
 
 
 6
 Nathaniel testified that although he did not know precisely why George needed the check, he could discern from the circumstances that 'something was up.' He insisted, however, that he did not think that George was going to put the check through banking channels. Nathaniel thought George was going to return the check in a few days because he needed it only 'to show it to somebody.'
 
 
 7
 The government's handwriting expert testified that Nathaniel was 'very probably' the writer of the authorizing signature, the payee's name, and the date on the check. He could not identify Nathaniel as the person who wrote the amount of the check, but he thought the amount could have been written by George.
 
 
 8
 The evidence as outlined above is insufficient to support the conviction of Nathaniel for aiding and abetting the misappropriation of postal funds. It is a well-established principle that one cannot aid and abet a crime that already has been committed. See United States v. Shulman, 624 F.2d 384, 387 (2d Cir. 1980); United States v. Ferraro, 414 F.2d 802, 804 (5th Cir. 1969). Although 'the clock does not stop for purposes of determining whether a participant is properly characterized as an aider and abetter or an accessory after the fact the moment a substantive crime is sufficiently complete to support a conviction,' United States v. York, 578 F.2d 1036, 1040 (5th Cir.), cert. denied, 439 U.S. 1005 (1978), we are not called upon in this case to make the subtle distinctions spoken of in York. Rather, the problem in this case, as the government concedes, is the absence of any direct evidence of when George took $1,315 worth of currency or goods from the post office. If George took the valuables after Nathaniel gave the check to him, the jury could infer that Nathaniel intended to assist George in his venture. If George took the valuables before Nathaniel gave the check to him, the jury could infer only that Nathaniel intended to help his brother evade detection and a judgment of acquittal would be required on the aiding and abetting count.
 
 
 9
 The government rightly insists that the absence of direct evidence is not fatal to its case against Nathaniel. A jury always is entitled to draw all reasonable inferences from the circumstantial evidence. In this case, however, the only circumstantial evidence relevant to the timing of the crime indicates that Nathaniel did not give the check to George until the valuables already had been taken.
 
 
 10
 The timing of Nathaniel's role in these events is not disputed. George contacted him on May 9, 1983 and asked if he had 'any old checks.' On May 11, 1983, Nathaniel took the check to George at the post office. Likewise, the outer limits of the timing of George's involvement is not disputed. He took the valuables sometime between April 13, 1983, the date of a prior audit, and May 12, 1983, the date of the audit which eventually revealed a shortage of $1,315.
 
 
 11
 Postal Supervisor Marva Chapman, a government witness, testified without contradiction or objection that a window clerk who is being reassigned must be audited and that George knew he would be audited. George learned on May 9, 1983 that he would be reassigned and thus that he would be audited. To conclude that Nathaniel aided and abetted George's crime, the jury would have to conclude that when George learned of the imminent audit he used the advance warning not to cover up a completed crime but to commit a new one. This would not be a reasonable inference.
 
 
 12
 Other available circumstantial evidence also supports the inference that the check was used to conceal a completed crime. Nathaniel testified that George stated that he needed the check only for a few days. Moreover, Nathaniel got the impression that George needed the check only to 'show it to somebody.' The available circumstantial evidence thus indicates that George originally planned to put the check in the cash drawer and then return it to Nathaniel when the audit was complete. Of course, the plan in fact backfired when the check was put through banking channels and came back non-negotiable; moreover, the jury was entitled to disbelieve all of Nathaniel's testimony. Nevertheless, this circumstantial evidence, in addition to the fact that George contacted Nathaniel and asked for an old check on the very day that he learned an audit would be conducted, is the only evidence relating to the timing of George's crime; all of the circumstantial evidence indicates that the check provided by Nathaniel was used to cover up, not to commit, the crime.
 
 
 13
 We must conclude that no reasonable juror could conclude beyond a reasonable doubt that Nathaniel was guilty of aiding and abetting the misappropriation of postal funds. In light of this disposition, we need not consider Nathaniel's claim that the district court committed plain error in failing to instruct the jury that they could not find Nathaniel guilty of misappropriating postal funds unless they found that he rendered assistance to George before he misappropriated the funds.
 
 
 14
 The judgment of conviction is reversed.
 
 
 
 *
 Honorable Timothy S. Hogan, Senior United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Teliferro Witcher is a young man whom Nathaniel had supervised in a 1977 summer youth program
 
 
 [2]
 Nathaniel also testified that he had lied at a postal hearing when he stated under oath that he had, in fact, received stamps for the check, that he did not know that the account on which the check had been drawn was closed, and that Teliferro Witch had signed the check